**BYERLYTE CORPORATION, Plaintiff,**

v.

**Parker C. WILLIAMS, District Director of Internal Revenue, Eighteenth District of Ohio, Defendant.**

**Civ. A. No. 31494.**

United States District Court
N. D. Ohio, E. D.

Aug. 19, 1958.

On Motion to Amend Findings and for Additional Findings Jan 8, 1959.

Samuel K. Walzer, David Ralph Hertz and Hertz & Kates, Cleveland, Ohio, for plaintiff.

Russell E. Ake, Cleveland, Ohio, for defendant.

McNAMEE, District Judge.

### Facts

Plaintiff is an Ohio corporation, and brings this action to recover with interest income and excess profit taxes for the years 1949 and 1950 which were paid under protest.

The principal issue is whether advancements made by plaintiff to its wholly owned subsidiary, Byerlyte Export Company, Ltd. (hereinafter called Export) were deductible as bad debts under Section 23(k), I.R.C.1939, 26 U.S. C.A. § 23(k), as claimed by plaintiff, or whether, as contended by defendant, such advances were contributions to capital governed by Section 117, I.R.C.1939, 26 U.S.C.A. § 117, which, as applied to the facts, permits no deductions. In the alternative, plaintiff claims that if the advances be considered as contributions to capital they must be regarded as investments in the shares of an affiliated corporation and that the loss sustained thereon is deductible under Section 23(g)(4), I.R.C.1939.

The salient facts may be stated as follows:

Since 1931 plaintiff has been engaged in the manufacture and sale of asphalt and allied products. Its shares of stock are held by members of the Myers family, who also manage and direct its business. D. N. Myers is president. His wife, Inez Myers, is vice president and his brother, Milton Myers, is secretary and treasurer.

In February 1947 plaintiff learned of the availability of asphaltic materials on the Island of Aruba, N.W.I. These asphaltic materials had accumulated from the dumping of refinery residues on the property of Lago Oil & Transport Company, a Canadian corporation, and an affiliate of The Standard Oil Company of New Jersey. After an examination of the materials plaintiff commenced negotiations with Lago looking to their acquisition. On May 7, 1947 plaintiff entered into a written agreement with Lago by the terms of which plaintiff agreed to remove and purchase a minimum of 600,000 tons of asphaltic pitch, 200,000 tons of which were to be purchased and removed within 3½ years from the date of the agreement and the balance at the rate of not less than 70,-000 tons per year. By the terms of the

agreement plaintiff was obligated to pay all expenses of removing the pitch and to furnish at its own expense all material, equipment, machinery, buildings, labor and supervision necessary to complete the removal and purchase as well as the removal of all equipment, machinery, buildings, etc. from Lago's property after the completion of the contract. Plaintiff was also required to deposit $30,000 to guarantee prompt payment of the purchase price, which was $5 per ton for the first 150,000 tons and $3 per ton for the balance f. o. b. the pitch pile "where is and as is." The agreement further provided that plaintiff's operations were to commence within 6 months after the date of the contract. It was expected that all of the pitch would be removed within a few years and in no event later than 10 years after the contract date. Shortly after the execution of the agreement plaintiff commenced preparations for the removal of the pitch. Equipment, machinery and materials were purchased and shipped to Aruba. Meanwhile plaintiff considered the advisability of organizing a subsidiary corporation whose only function would be to conduct the operations necessary to prepare the asphaltic pitch for shipment. On September 16, 1947 the subsidiary, The Byerlyte Export Company, Ltd., was incorporated under the laws of the Dominion of Canada, with an authorized capital of 10,000 shares, having a par value of $5 per share. D. N. Myers, president of plaintiff, testified that considerations of tax avoidance played no part in the decision to incorporate the subsidiary. According to him, this step was taken to enable plaintiff to conduct the operations on Aruba, with a minimum of business risk. As stated in plaintiff's reply brief, the chief reason for the organization of a separate corporation was "Byerlyte's reluctance to risk all its resources in an operation in a foreign country under Dutch Colonial Government."

Plaintiff gained no operating advantage by conducting part of its business through the subsidiary nor was there any such advantage gained by the use of a foreign rather than a domestic corporation as a subsidiary. It was contemplated that Export would limit its operations to such as were necessary to remove the asphaltic materials, transport them on the Island and prepare them for transoceanic shipment and that plaintiff, the parent corporation, would make all purchases from Lago, sell the materials to customers and bear the cost of shipment from Aruba to destination. Under this plan it was considered that plaintiff could fulfill the obligations it assumed under the agreement with Lago by making expenditures for and advancing funds to Export, thus obviating the need of any substantial stock investment in the latter company. Accordingly, only 6 shares of stock of the subsidiary were issued to plaintiff for $30. This constituted all the outstanding shares of Export. No stock certificates were issued by Export nor did it have a stock certificate book. D. N. Myers estimated it would entail an expenditure of between $100,000 and $125,000 to commence operations in Aruba. Prior to the incorporation of Export plaintiff had expended approximately $88,000 for that purpose. This amount was entered on the books of plaintiff as an advance and recorded on the books of Export as an account payable to plaintiff. At the time Export was organized it was estimated that additional expenditures in substantial amounts for machinery, equipment, etc. would be necessary before operations could commence under the agreement. Such expenditures were made by plaintiff and charged to Export as loans. In addition, substantial cash advances were made to Export which likewise were treated as loans. The officers of plaintiff were of the opinion that the contract with Lago was an extremely valuable asset. It was believed that there were markets in Spain, Sweden, France and Italy for the asphaltic material which is used in those countries for the manufacture of coal briquettes. The proposed selling price in foreign countries was between $24 and $25 per ton and the estimated cost of removing,

preparing, selling and shipping was $20 per ton, thus yielding an expected per ton profit of $4 or a profit of $2,400,000 on the entire operation. The original plan called for the payment to Export of a service fee of $1.50 per ton over and above cost for the work of removing and preparing the asphalt for shipment. Plaintiff expected to ship about 200,000 tons the first year. On the basis of the plan this would have yielded a profit to Export of $300,000. It was from the anticipated profits of Export that plaintiff expected to receive repayment of its advances. Plaintiff retained the contract with Lago as its own and was to receive all profits over and above the service fee of $1.50 per ton to be paid Export. Although the original plan was as stated above, plaintiff also had conversations with The Great Lakes Carbon Company relative to the acquisition by the latter of an interest in the Aruba venture. Following such conversations Great Lakes Carbon Company on April 12, 1948 forwarded a letter to D. N. Myers in which Great Lakes offered to purchase a 50% interest in the subsidiary for $250,000 and to advance $500,000 by way of loans upon conditions specified in the letter. The most important of these conditions were that the Lago contract was to be assigned to the subsidiary or a corporation to be organized in the United States —as Great Lakes Carbon Company might elect; that at the time of the acceptance of the offer plaintiff shall have advanced or made available to the subsidiary the sum of $500,000 to be used for the purchase of machinery and equipment; that $300,000 of plaintiff's advances were to be paid out of the $500,000 advanced by Great Lakes and that the advances of both corporations to the subsidiary were "to be covered" by promissory notes. It was a further condition of the offer that Great Lakes was to have direct management of the company's sales and operations and to receive a commission of $1 per ton on all material sold. In summation of its proposal Great Lakes stated:

> " * * * However, the net effect remains that we would be putting

the full amount of $750,000 at risk in the venture. You would be immediately taken out of risk as a result of our paying you $250,000 for capital stock and arranging to retire $300,000 of the notes that you hold against the company. * * * continued favorable and profitable operations would take us out on our risk to the extent of $500,000, and net profits would be available thereafter for equal division between us."

Plaintiff refused the offer as not being adequate. Soon thereafter it developed that because of the lack of demand abroad for asphaltic materials and the inability of foreign companies to make payment in American dollars, there was little or no profitable foreign business to be had. It therefore became necessary to look to the American market for customers. However, the results in this respect also were disappointing. The cost of preparing the material for the American market was 150% higher and only a few sales were made. Because of the lack of buyers it became expedient to deviate slightly from the original plan. Instead of Export making all sales to plaintiff the subsidiary made a few sales directly to others and also rented its buildings and equipment and rendered services to others through the use of its equipment and employees. However, the total volume of business done by Export in the three years of its existence was only $178,763.36, of which $26,590.62 represents the sale of products to plaintiff and $5,288.47 represents sales of products to others. The balance of the gross receipts of Export represented rentals and services. Export operated at a substantial loss each year of its existence. However, plaintiff continued to make advances until December 1950, at which time the total of such advances shown on plaintiff's books as accounts receivable and on Export's books as accounts payable was $564,661.72. Of this amount $277,500 represented loans by D. N. Myers to plaintiff, which loaned the money received by it from Myers to Export. Myers received promissory notes bearing 2½% interest from plain-

tiff for these loans, which were eventually paid but without interest. There was no interest charged on the advances by plaintiff to Export nor was any maturity date fixed for any of the advances. No attempt was made by plaintiff to collect any part of the advances from Export. The advances were recorded on plaintiff's balance sheet as "deferred assets." Because of plaintiff's failure to purchase a minimum of 200,000 tons of pitch within 3½ years, Lago Oil & Transport cancelled its contract with the plaintiff in December 1950. Shortly thereafter Export was dissolved and its assets transferred to plaintiff. Plaintiff estimated that these assets had a gross valuation of $115,000 and a net value of $96,817.-16. The latter amount was credited to Export's account. The balance of the indebtedness amounting to $467,844.56 was treated by plaintiff as a bad debt and on which deductions were taken in its income tax return of 1949 by way of carry-back and also in its 1950 return. Defendant disallowed the deductions on the grounds: (1) that the gross value of Export's assets was $142,014.75, less liabilities of $20,319.65, or a net asset value of $121,695.10; (2) that the advances were contributions to capital on which no deductions were allowable. The defendant's ruling resulted in the payment by plaintiff, under protest, of $71,-031.50 on its 1949 tax and $45,226.41 on its 1950 tax. This suit followed.

### Were the Advances to Export Debts or Contributions to Capital?

In the plethora of precedent on this issue there is to be found no single rule, principle or test that is controlling or decisive of the question whether advances by stockholders to a closely held or solely owned corporation are to be considered as debts or contributions to capital. As the Supreme Court said in John Kelley Co. v. Commissioner, 326 U.S. 21, at page 530, 66 S.Ct. 299, 304, 90 L.Ed. 278:

> "There is no one characteristic, not even exclusion from management, which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts. So called stock certificates may be authorized by corporations which are really debts and promises to pay may be executed which have incidents of stock."

However, it is the teaching of the cases that certain criteria may be considered as reliable indicators of the distinction between equity capital and debt. Among such criteria are—the form of the transaction—the equity capital—debt ratio; the use to which the funds were put; whether outsiders would make such advances and the lack of reasonable expectations of payment. In Gilbert v. Commissioner, 2 Cir., 248 F.2d 399, at page 406, the court observed:

> "These are proper subjects of consideration, for the Congress evidently meant the significant factor to be whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business, and, as we shall show, each of the enumerated items does or may bear on the degree of the risk involved."

To the foregoing may be added—whether the obligations have a fixed maturity date; whether payments are to be made out of earnings only; whether the so-called creditor participated in management; whether the so-called creditor is inferior to regular corporate creditors; the expressed intent of the parties; whether the initial capital was adequate to begin the corporate life.

Among the factors entitled to great weight is the intention of the parties. Here there was in reality but one party. Plaintiff owned and controlled Export and dominated and directed its affairs. D. N. Myers expressed the view that there was no need for the investment of capital in the subsidiary. Plaintiff was under no obligation to organize a subsidiary corporation but for reasons satisfactory to itself it took this step for the purpose of conducting, through the subsidiary, the operations necessary to make

the asphaltic materials on the Island saleable. D. N. Myers estimated that between $100,000 and $125,000 would be necessary for such purpose. That this was a low estimate is evidenced by the estimate of Great Lakes Carbon Company as to the amount necessary to invest "at risk in the venture" and by subsequent events. The contract with Lago, which was thought originally to have great potential value, was retained by plaintiff. Upon its incorporation Export had no capital assets except the insignificant amount of $30 paid by plaintiff for 6 shares of stock. Capital is the economic life blood of corporate existence. Without capital a corporation cannot function as a viable legal entity. It was therefore necessary at the outset that Export be supplied with adequate capital to enable it to commence operations. This was accomplished by the expenditures of plaintiff for capital assets and its advances of working capital, all of which were treated as loans to Export. Under the circumstances there could be no reasonable expectancy of repayment of the advances except upon success of the venture. Treating the advances as loans did not alter their essential character as contributions to capital. Subsequent advances followed the same pattern. The optimistic hopes of a substantial volume of sales failed to materialize and Export operated at a substantial loss during all of its existence. About the middle of 1948 it became apparent that the anticipated business from foreign countries would not develop. It was not until October 1948 that the first sale of asphaltic pitch was made. The total of all such sales by Export was $31,879.09. Notwithstanding the deficit operations of Export, plaintiff continued to advance funds in the hope of improvement in business. In Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., 7 Cir., 132 F.2d 182, 186, the court delineated the distinction between a stockholder and a creditor as follows:

"It is often said that the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event."

A similar distinction is made by the 6th Circuit Court of Appeals in United States v. Title Guarantee & Trust Co., 133 F.2d 990, 993. While plaintiff's subjective intent, as expressed by D. N. Myers, was to make no capital investment in Export, the objective evidence of plaintiff's intent bespeaks a clear contrary purpose "to make an investment and take the risks of the venture."

In speaking of advances that may be regarded as debts for tax purposes, the court, in Gilbert v. Commissioner, supra, said:

"The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof. While some variation from this formula is not fatal to the taxpayer's effort to have the advance treated as a debt for tax purposes, Commissioner of Internal Revenue v. O. P. P. Holding Corp., 2 Cir., 76 F.2d 11, too great a variation will of course preclude such treatment. Gregg Co. of Del. v. Commissioner, 2 Cir., 239 F.2d 498; Jewel Tea Co. v. United States, 2 Cir., 90 F.2d 451." 248 F. 2d at pages 402, 403.

The advances in question here bear none of the indicia of debts which may be treated as such for tax purposes. There was no fixed maturity date for the payment of the advances. There were no notes evidencing the so-called loans. No agreement was made for the payment of interest. There was no fixed maturity date. The advances were treated by plaintiff as deferred assets. No outsider would have loaned money to Export. D. N. Myers made no loans directly to Export even though he advanced substantial amounts to plaintiff to be used for such purpose. No attempt was made to enforce collection of the

loans. Indeed such action would have resulted in the termination of the subsidiary's existence. The equity capital—debt ratio rose to the amazing and unprecedented proportion of 18,800 to one. Here indeed was an example of one of "those extreme situations such as nominal stock investments and an obviously excessive debt structure," referred to by the Supreme Court in John Kelley Co. v. Commissioner, supra. The effect of such imbalance between equity capital and debt is spelled out clearly in Gilbert v. Commissioner, supra, as follows:

> "The relationship of 'nominal stock investments' or 'an obviously excessive debt structure,' to use the phrases employed by the Supreme Court in John Kelley Co. v. Commissioner, 326 U.S. 521, 526, 66 S.Ct. 299, 302, 90 L.Ed. 278, to the degree of risk involved is clear. Any 'loan' to the corporation in such circumstances would necessarily be venture capital in reality, for any business loss by the corporation would be reflected in an inability to repay the 'loan.'" 248 F.2d at page 407.

See also Root v. Commissioner, 9 Cir., 220 F.2d 240; Schnitzer v. Commissioner, 13 T.C. 43, 62, affirmed 9 Cir., 183 F.2d 70; Janeway v. Commissioner, 2 T.C. 197, affirmed 2 Cir., 147 F.2d 602; Dittmar v. Commissioner, 23 T.C. 789.

■ Under the rule of Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596, the pertinent inquiry here is: Were the advances treated by the taxpayer as loans in reality contributions to capital? Upon a review of the evidence, that question must be answered in the affirmative. I hold, therefore, that the advances by plaintiff to Export were made at the risk of the venture and were contributions to capital. It would serve no useful purpose to review the cases cited by plaintiff. In one respect or another, and in some cases in many respects, the authorities on which plaintiff relies are distinguishable from the case at bar.

Were the Advances Investments in Worthless Stock of an Affiliated Corporation and Deductible as an Ordinary Loss?

■ The determination hereinabove made that the taxpayer's advances were contributions to the capital of a subsidiary corporation is tantamount to holding that such advances constituted an investment in stock of the subsidiary. Section 23(g) (3). Gussow, Kahn & Co., Inc., v. Commissioner, 13 T.C. 580. Plaintiff contends that if it be established that its investment was in an affiliated corporation it may deduct its loss as an ordinary loss even though its investment did not become worthless in 1950. Defendant's position is that plaintiff would be entitled to treat the loss on its investment in the subsidiary as an ordinary loss only upon showing (1) that the stock of the subsidiary became worthless in 1950, and (2) that the subsidiary was an affiliated corporation. Defendant correctly states the burden resting on plaintiff and plaintiff's failure to sustain that burden as to either or both issues stated above would be fatal to its right to recover. For the reasons hereinafter to be stated, I am of the opinion that plaintiff has failed to show that its investment in Export became worthless in 1950. Ordinarily such determination would render a finding on or a discussion of the issue of affiliation unnecessary. However, because of the importance of the issue and the desirability of a review of this Court's determination thereof, in the event of an appeal, I shall discuss the issue of affiliation.

Section 23(g) (4) reads as follows:

"(4) Stock in affiliated corporation. For the purposes of paragraph (2) stock in a corporation affiliated with the taxpayer shall not be deemed a capital asset. For the purposes of this paragraph a cor-

poration shall be deemed to be affiliated with the taxpayer only if:

"(A) at least 95 per centum of each class of its stock is owned directly by the taxpayer; and

"(B) more than 90 per centum of the aggregate of its gross incomes for all taxable years has been from sources other than royalties, rents (except rents derived from rental of properties to employees of the company in the ordinary course of its operating business), dividends, interest (except interest received on deferred purchase price of operating assets sold), annuities, or gains from sales or exchanges of stocks and securities; and

"(C) the taxpayer is a domestic corporation."

All of Export's stock was owned by plaintiff, which is a domestic corporation. Concededly, therefore, Export met two of the statutory requirements of an affiliated corporation. A dispute arises as to whether Export qualifies as an affiliate under the provisions of "(B)". It is contended by defendant that less than 90% of the aggregate of the gross incomes of the subsidiary were derived from sources other than rents, thus disqualifying Export as an affiliated corporation.

There were two rental accounts on the books of the subsidiary. Real estate rents were recorded in the sum of $12,590.89. Income from rentals of equipment was separately recorded as being $15,813.36. The total rents received as shown in both accounts was $28,424.25. Manifestly this is considerably in excess of 10% of Export's total income of $178,763.36 and the balance is less than 90% of its gross income. However, in 1950 plaintiff's auditor analyzed the above rental accounts and found the actual amount properly chargeable to rentals of equipment to be but $2,737.88. The auditor testified that upon an examination of the invoices and daily reports of Export, together with information obtained by him directly from the manager of Export's business in Aruba, he classified all entries in the rental equipment account except those representing the sum of $2,737.88 as being sales of services. According to the auditor it was sound accounting practice and consistent with the facts to classify all transactions where an operator was furnished with the equipment as sales of services whereas in those instances where machinery or equipment was delivered to others for use by them the transactions were rentals of equipment. It was upon this principle that the auditor's classification was made. As a result of such classification the total of all rents received by Export, including rentals from real estate which remained unchanged at $12,590.89, was reduced to $15,324.26. Although the term "rent" was applied originally only to payments received by an owner of real property for the use and occupancy of such property by a tenant or lessee, by common usage the term has been enlarged to include payments received by an owner of personal property from one to whom the owner has entrusted the custody of such property and to whom the owner has granted the exclusive right to its use for a definite period of time. However, such transactions are readily distinguishable from those where the owner of operative chattels, such as trucks, tractors, steam shovels, etc., agrees to do work for another by using the equipment for that purpose. In the latter case the property remains in the possession and under the control of the owner who, either personally or through his employees, performs the work by using the equipment. I think the auditor was correct in classifying such transactions as services. It thus appears that the total rents received were $15,324, which is less than 10% of the gross income recorded on the books of Export.

The defendant advances the further contention that the stated gross income of $178,763.36 is an inflated figure which includes as an item of gross income the total revenue from sales in the sum of $31,879.09 instead of the lesser amount of gains, if any, realized from such sales.

As defined in Section 22(a), I.R.C. 1939, 26 U.S.C.A. § 22(a), gross income from the sale of products means the gains or profits derived therefrom as represented by the difference between the sale price of the goods and their cost. In short, in Section 22(a) gross income from sales means gross profits. Defendant contends that gross income as used in Section 23(g) (4) (B) has the same meaning as when used in Section 22(a) and that inasmuch as plaintiff has failed to show its gross profits, if any, from the sale of products, it has not established a true amount of its gross income. Plaintiff contends, however, that gross income as used in "(B)" means gross receipts and that its reported gross income is correct. The issue thus raised presents an interesting question of statutory construction.

■■ It is not stated in Section 22 (a) that the term "gross income" as therein defined shall be uniformly applied wherever such term appears in the Internal Revenue Code. Nor is such uniform application required by the provisions of any other section of the Code. Ordinarily courts are bound to accept the law-making body's construction of its own language by means of definition of the terms employed. 50 Am.Jur. 254, Sec. 262. But this canon of construction is not inflexible. It may be relaxed where the statutory definition is not exclusive and an exception arises where the application of the statutory definition would destroy the purpose of the statute or create obvious incongruities in its language. Lawson v. Suwanee Fruit & S. S. Co., 336 U.S. 198, 69 S.Ct. 503, 93 L. Ed. 611. The term "gross income" is not a term of art and if by its use in "(B)" Congress intended a broader and the more usual concept of that term, such broader definition must be given effect. Lawson v. Suwanee Fruit & S.S. Co., supra. Whenever the context and subject matter so required, courts have held gross income to be the equivalent of gross receipts. 38 C.J.S. Gross p. 1081; First Trust Co. v. Commonwealth Co., 8 Cir., 98 F.2d 27, 28; Alexander v. Alex-ander, 10 Cir., 158 F.2d 429. The dictionary definition of the term also equates gross income with gross receipts. Webster's New International Dictionary, 2nd Ed. p. 1258.

Section 23(g) (4) provides in effect that stock in an affiliated corporation which has become worthless shall not be considered a capital asset thereby permitting the total loss of a taxpayer's investment in such stock to be treated as an ordinary loss. As shown above, Section 23(g) (4) (B) prescribes as a condition of corporate affiliation that—

"* * * more than 90 per centum of the aggregate of its gross incomes for all taxable years has been from sources other than royalties, rents (except rents derived from rental of properties to employees of the company in the ordinary course of its operating business), dividends, interest (except interest received on deferred purchase price of operating assets sold); * * *."

As shown by the legislative history of the section, the parenthetical clauses in "(B)" with their references to "operating business" and "operating assets" were incorporated therein by amendment in 1942 "to permit the loss as an ordinary loss only when the subsidiary was an operating company as opposed to an investment or holding company." See Seidman's Legislative History of Federal Income and Excess Profit Tax Laws, Vol. 1 p. 332—quoting from Senate Discussion.

■ Thus in "(B)" Congress has prescribed as a condition of a subsidiary's affiliation with the taxpayer that the subsidiary be an operating company. The normal and logical way to determine whether a subsidiary meets that condition is by ascertaining the proportion of its total revenue derived from its operations. This was the method adopted by Congress in prescribing the condition that 90% or more of the gross income of a subsidiary must be from other than non-operating sources. Congress was not unmindful that an operating compa-

ny whose stock became worthless might not realize any gross profits and that conceivably the lack of such profits might be the primary cause of the corporation's insolvency. It would seem clear, therefore, that considered in the light of the purpose of 23(g) (4) the term "gross income" as used in "(B)" necessarily means "gross receipts." Under the construction for which defendant contends, Section 23(g) (4) (B) would operate unequally and unreasonably and would produce incongruous and unjust results. To illustrate:

Corporation X has a gross revenue from sales of $200,000. However, by reason of falling prices and tight competitive conditions all its sales were made below cost. The corporation's only other income was from rent in the sum of $1,000. Under defendant's construction, Corporation X would have received no gross income from its operations and its total gross income would be $1,000 received as rent. Corporation X would therefore be disqualified as an affiliate even though 99½% of its gross revenue was derived from its operations and only one-half of 1% from rent. The same disqualifying effect would result if Corporation X realized gross profits of $20,000 on its sales of $200,000 and received interest and rent amounting to $5,000. Under the latter hypothesis the gross income of Corporation X would be $25,000 of which the amount derived from operations would represent only 80% although the gross revenue from sales was 97½% of its total revenue.

■■ A construction capable of producing such capricious and incongruous results must be rejected. Whenever a word or term in a statute is susceptible of two constructions it is the duty of the court to adopt that construction that will avoid unreasonable, absurd and unjust consequences. In such cases the court is required to construe the doubtful term reasonably and consistently with the purpose of the statute when read as a whole. 50 Am.Jur. 380, 381, 386. There would seem to be no doubt that it was the Congressional purpose to extend the ben-

efits of Section 23(g) (4) to all domestic corporations owning 95% of the worthless stock of a subsidiary where more than 90% of the subsidiary's gross receipts were derived from its operations. That purpose can be effectuated only by ascribing to the term "gross income" as used in "(B)" its broader and more usual meaning of gross receipts. I hold, therefore, that gross income as used in "(B)" means gross receipts. It follows that Export's gross income was correctly stated as being $178,763.36. The amount Export received as rent was $15,324.26 and the amount received by Export from sources other than rent was more than 90% of its total gross income.

In view of these determinations it must be held that Export was affiliated with plaintiff.

There remains to be determined the question whether plaintiff's loss on its investment in Export may be treated as an ordinary loss. Section 23(g) (2) provides:

"(2) Securities becoming worthless. If any securities (as defined in paragraph (3) of this subsection) become worthless during the taxable year and are capital assets, the loss resulting therefrom shall, for the purposes of this chapter, be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets."

Section 23(g) (3) defines "securities" as used in paragraph (2) as being "(A) shares of stock in a corporation, and (B) rights to subscribe for or to receive such shares."

Section 23(g) (4) provides in part: "For the purposes of paragraph (2) stock in a corporation affiliated with the taxpayer shall not be deemed a capital asset." Plaintiff contends in effect that by the language of (g) (4) quoted above, Congress intended to allow a taxpayer to deduct as an ordinary loss a partial loss on its investment in an affiliated corporation. This contention disregards the plain intendment of (g) (4) that it is for the purposes of (g) (2) that stock in an affiliate shall not be considered a

capital asset. Manifestly, the purposes of (g) (2) are to define the extent of the deductions allowable to a corporation owning stock in another corporation which is a capital asset and which became worthless in the taxable year,— and to define the deduction that may be taken when stock which has become worthless during the taxable year is stock in an affiliated corporation. In the latter case, by virtue of (g) (4), such stock shall not be deemed to be a capital asset.

■ Although plaintiff subscribed for but 6 shares of Export's stock and paid only $30 therefor, it was the owner of all of the equity interest in Export and, as shown above, contributed $564,661.72 to the capital of its affiliate. Under the principle laid down in Gussow, Kahn & Co., Inc. v. Commissioner, supra, plaintiff had the right to subscribe for and receive all of the shares of Export. Plaintiff's investment in Export did not become worthless in 1950. On the basis of its own evaluation of the assets received from Export on dissolution of the latter, plaintiff received assets having a net value of approximately $96,000. The Commissioner's valuation of the assets received by plaintiff from Export was about $121,000. On the basis of either of the above evaluations, plaintiff's investment in Export had a substantial value in 1950. True its loss was great, but its investment was not worthless. In Gussow, Kahn & Co., Inc. v. Commissioner, supra, the Tax Court held that advances made by the taxpayer to its affiliate were contributions to capital rather than loans as shown on the taxpayer's books. Plaintiff contends that in that case the taxpayer received a return of a part of its advances but nevertheless was held entitled to deduct the balance as an ordinary loss. But a careful reading of the opinion in the cited case discloses clearly that the taxpayer secured no return of any part of its contributions to the capital of the affiliate. The total advances in that case during the years 1943–44 were $11,334.43. Two such advances in the amounts of $300 each were made after it was decided to liquidate the affiliate. That the Tax Court did not consider the $600 last advanced in 1944 as a contribution to capital is clear from the following statement in the court's opinion:

"The stipulation shows that petitioner advanced to Tomorrow's Masterpieces after the first part of November, when it was determined it would be liquidated, the amount of $600. It has not been shown that there was any obligation to make such payment. We do not believe that a taxpayer should be permitted to deduct a loss for advances made to its wholly owned subsidiary after, it is decided, as it was here, that such subsidiary will be liquidated. Such advances could not and were not intended to rehabilitate the venture and restore its prospect of success." (13 T.C. at page 586.)

The taxpayer in Gussow, Kahn & Co. v. Commissioner, supra, received no return of any part of its contributions to the capital of its affiliate and was allowed to deduct as an ordinary loss the loss sustained by reason of the worthlessness of its investment. In Commissioner v. Spaulding Bakeries, Inc., 252 F.2d 693, the Court of Appeals for the 2nd Circuit affirmed the Tax Court, 27 T. C. 684, which allowed the taxpayer to deduct as an ordinary loss its total loss resulting from the worthlessness of its investment in the common stock of its affiliate.

Plaintiff asserts support for its position is found in one of the examples cited as illustrative of the operation of Internal Revenue Regulation 111—§ 29.-23. That example, like the regulation it is designed to illustrate, deals with the subject of losses sustained by a taxpayer on its worthless investment in an affiliate. The example states inter alia:

"Corporation S, a domestic manufacturing corporation which makes its income tax returns on the calendar years basis owns 96 per cent of the common stock of Corporation R which has from its inception derived

all its gross income from manufacturing operations, became worthless during 1942. * * * Since Corporation R is deemed to be affiliated with Corporation S for the purposes of section 23(g) (4) and this section, the stock of Corporation R is not a 'capital asset' in the hands of Corporation S for the purposes of section 23(g) (2) and section 29.23(g–1). Consequently, in computing the net income of Corporation S for 1942, *any* loss upon such stock under section 23(f) will be deducted as an ordinary loss and will not be circumscribed by the provisions of section 23(g) or section 117." · (Emphasis supplied.)

In contending that "any" describes a partial loss, plaintiff misreads the significance of that word. The phrase "any loss upon such stock" is clearly referable to the antecedent phrase describing stock "which became worthless in 1942."

Plaintiff also cites and relies upon Dorminey v. Commissioner, 26 T.C. 940. That case is not in point. It was there held that an individual taxpayer was entitled to deduct advances to one corporation as a bad debt deduction under Section 23(k) (1). It was also held in that case that the taxpayer's capital investment in another corporation which became worthless in 1947 should be treated as a long term capital loss.

I find no basis for holding that plaintiff's loss on its investment in Export may be deducted as an ordinary loss. The defendant submits cogent reasons in support of its claim that the liquidation of Export was a non-taxable transaction on which no loss (or gain) may be allowed under Section 112, 26 U.S.C.A. § 112. I find it unnecessary to discuss this contention. Whether the taxpayer's loss is governed by Section 117 and must be considered a capital loss or whether Section 112 applies is immaterial. In either event under the facts of this case the taxpayer would be entitled to no deduction. It is enough to say that plaintiff's investment in Export did not become worthless in 1950 and that plaintiff may not deduct its loss on such investment as an ordinary loss.

Judgment may be entered for the defendant.

This opinion constitutes findings of fact and conclusions of law in accordance with Fed.Rules Civ.Proc. Rule 52 (a), 28 U.S.C.A.

## On Motion to Amend Findings and for Additional Findings

Plaintiff has filed a motion requesting that the Court amend its findings by striking therefrom all findings "relating to the requirement of worthlessness under Section 23(g) (2) of the 1939 Internal Revenue Code". Plaintiff also requests three additional findings to show the inapplicability of Section 112(b) (6). The Government requests the Court to find that the distribution of assets by the subsidiary to the plaintiff was a complete liquidation of the subsidiary within Section 115(c), 26 U.S.C.A. § 115(c) and that Section 112(b) (6) is applicable.

The gist of plaintiff's argument in support of its motion to amend is that the Court misapplied Section 23(g) (2), which governs only in cases where a taxpayer's stock in another corporation, which is a capital asset, becomes worthless, whereas the plaintiff's loss was on stock in an affiliated corporation, which is not a capital asset and hence is not governed by Section 23(g) (2). This argument must be rejected. In its statement of reasons supporting its decision this Court said inter alia:

"This contention disregards the plain intendment of (g) (4) that it is for the purposes of (g) (2) that stock in an affiliate shall not be considered a capital asset. Manifestly, the purposes of (g) (2) are to define the extent of the deductions allowable to a corporation owning stock in another corporation which is a capital asset and which became worthless in the taxable year,—*and to define the deduction that may be taken when stock which has become worthless during the taxable year*

*is stock in an affiliated corporation.* In the latter case, by virtue of (g) (4), such stock shall not be deemed to be a capital asset." 170 F.Supp. 58.

Plaintiff's argument rests entirely upon the italicized portion of the language quoted above. The italicized language must be read in connection with the sentence immediately following, which refers to Section (g) (4) and the effect of that section on (g) (2) where there is a total loss on stock in an affiliated corporation. Effect must be given also to the Court's earlier statement that— "* * * the plain intendment of (g) (4) that it is for the purposes of (g) (2) that stock in an affiliate shall not be considered a capital asset." When these portions of the opinion are read in connection with the italicized language it is apparent that the Court did not intend to hold and did not hold that, standing alone, the provisions of (g) (2) were applicable to determine the deduction allowable on worthless stock in an affiliated corporation. The Court treated the pertinent provisions of (g) (4) (excluding the definition of "affiliation") as being in the nature of an amendment to (g) (2), which modifies that section in the following respect: (g) (2) defines the deduction that may be taken when stock which has become worthless is a capital asset. Stock in an affiliated corporation is a capital asset but by virtue of (g) (4) it is excepted from that classification solely for the purposes of (g) (2).

The legislative history of (g) (4) lends support to this view. Section (g) (4) was added to section (g) by the Act of October 21, 1942. At that time (g) (2) was in the same form as it was on the critical date of plaintiff's loss and for some time thereafter. The Act of 1942 was designed to accomplish two purposes,—(1) to define an affiliated corporation, and (2) to provide that for the purposes of (g) (2) stock in an affiliated corporation was not to be considered as a capital asset. After the passage of the Act of October 1942 the express terms of (g) (2) remained the same but it requires no citation of authority to show that existing statutes or parts thereof may be changed or modified by independent legislation. The same result would have been achieved if the draftsman of the legislation had included only the definition of an affiliated corporation in (g) (4) and added the first sentence of that section as a proviso to (g) (2) as follows: "* * provided, however, that for the purpose of this section stock in an affiliated corporation as defined in paragraph 4 shall not be deemed a capital asset."

The pertinent regulation of the Internal Revenue Bureau as cited by plaintiff reads:

"Regulation 111, Sec. 29.23(g-2)

"Loss on stock of affiliate. If a taxpayer is a domestic corporation and is affiliated, within the definition in section 23(g) (4), with another corporation, the stock in such affiliated corporation owned by the taxpayer is not considered to be a 'capital asset' of the taxpayer for the purpose of determining the loss from the worthlessness of such stock within the provisions of section 23(g) (2) and section 29.23 (g-1). For the purposes of section 23(g) (2), section 23(g) (4), section 29.23(g-1), and this section, a corporation shall be deemed to be affiliated with the taxpayer only if all the following factors are present:"

Fairly construed, the opinion of the Court holds that (g) (2) and (g) (4) when read together determine the deduction allowable to a taxpayer whose stock in an affiliated corporation has become worthless.

Plaintiff also contends that the test of worthlessness applies only to capital assets. That would be true except for (g) (4) which expressly provides that "for the purposes of (g) (2) stock in an affiliated corporation shall not be deemed a capital asset." As I understand the language of (g) (4), stock in an affiliated corporation is to be con-

sidered a non-capital asset solely for the purposes of (g) (2). For all other purposes such stock retains its character as a capital asset. Otherwise stated, stock in an affiliated corporation is a capital asset but shall not be treated as such for tax purposes when it becomes worthless. It seems clear that by the pertinent provisions of (g) (4) Congress intended that a taxpayer who sustained a total loss on stock in a corporation that met all the conditions of affiliation should receive more liberal treatment tax-wise than a taxpayer who sustained a total loss on stock in a non-affiliated corporation. In the latter case the taxpayer may compute his deduction on the basis of a hypothetical sale of worthless stock as of the last day of the year in which the loss occurred. However, where stock in an affiliated corporation becomes worthless the taxpayer may compute the deduction by treating the loss as a non-capital loss under 23 (f). It is beside the point to argue that partial losses are deductible under section (f). Partial losses on securities are not governed by that section. It is only in the exceptional case where stock in an affiliated corporation becomes worthless that section (f) applies to securities. In such cases the loss is treated as an ordinary loss by virtue of the provisions of (g) (2) and (g) (4) which are effective to bring section (f) into play.

Plaintiff's motion to amend the findings is overruled.

### Request for Additional Findings

As indicated, plaintiff requests three additional findings under 112(b) (6). The first two suggested findings relate to the adoption of resolutions by the taxpayer and its affiliate at the time of the liquidation of the latter and book entries made pursuant thereto. The Government has no objection to such findings.

The third finding suggested by the taxpayer reads:

"(3) That neither Export nor Byerlyte considered that the transfer aforesaid was to be applied in any amount or degree otherwise than in the reduction of the said advances and neither considered that such transfer was to be in cancellation or in redemption of all Export's stock."

This suggested finding is objected to by the defendant as being irrelevant. Defendant requests the Court to find that the distribution of assets by the affiliate to the taxpayer was a distribution in complete liquidation of the subsidiary within the meaning of section 115(c) and 112(b) (6). Section 115(c) in its pertinent parts provides:

"Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock * * * The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112."

Section 112(b) (6) provides in part:

"(6) Property received by corporation on complete liquidation of another. No gain or loss shall be recognized upon the receipt by a corporation of property distributed in complete liquidation of another corporation. For the purposes of this paragraph a distribution shall be considered to be in complete liquidation only if—"

Then follows an enumeration of conditions under subsections (A), (B) and (C). There is no question that the conditions of (A) and (B) are met. The only issue is whether under (C) the distribution was received by plaintiff "in complete cancellation or redemption of all its stock." This Court has held that the advances made by plaintiff to its affiliate which were treated by plaintiff as loans were in fact and legal effect contributions of risk capital. Plaintiff was the owner of all of the stock in the affiliate. Although its record ownership was represented by only six shares, plaintiff had the right, by reason of its contributions to the capital of Export, to

receive all of the shares of stock of the latter. Therefore, when Export was liquidated and distributed its assets to plaintiff such distribution was in complete cancellation and redemption of plaintiff's capital investment in Export. Plaintiff cites and relies upon Houston Natural Gas Corp. v. Commissioner of Internal Revenue, 5 Cir., 173 F.2d 461 and Commissioner v. Spaulding Bakeries, Inc., 2 Cir., 252 F.2d 693. In Houston Natural Gas case, supra, the single question was whether the taxpayer on liquidation of its subsidiaries in 1940 realized taxable income representing the difference betwen the purchase price of certain bonds and their face value. The ·taxpayer contended that the gain was realized at the time of the liquidation of the subsidiaries and was non-taxable under Section 112(b) (6). In denying the taxpayer's claim, the court held that the transfer on liquidation of the assets of the subsidiaries to the taxpayer did not include a transfer of the bonds and that the gain was taxable. In the Spaulding Bakeries case the court held that a distribution only in respect of the non-voting preferred stock of the dissolved corporation was not a distribution in complete cancellation of all the stock as required by the statute. Neither of the cited cases is in point. Here there was a distribution of the assets of the subsidiary in complete cancellation of all of its stock. Accordingly plaintiff's motion for additional findings is granted as to requested Findings 1 and 2 and overruled as to requested Finding No. 3. Defendant's request for an additional finding is granted. The following findings may be added to those appearing in the Court's opinion of August 19, 1958:

"(1) That prior to the transfer of Export's assets to Byerlyte in December of 1950, both Export and Byerlyte by appropriate action, adopted resolutions which authorized the transfer and acceptance respectively, of all Export's assets at their fair market value, said sum to apply against the advances to Export by Byerlyte as they then appeared upon the accounts of both corporations.

"(2) That subsequent to such transfer, the books of Byerlyte and Export respectively were caused to reflect a reduction in the said advances equal to the sum representing the fair market value claimed by the taxpayer.

"(3) That by reason of its contribution to the capital of Export, plaintiff was entitled to receive all of the shares of stock of its affiliate; that the transfer of the assets of Export to plaintiff on liquidation of the affiliate was in complete cancellation of all of the shares of stock which plaintiff owned and was entitled to receive."

As stated in the Court's opinion filed August 19, 1958, judgment may be entered for the defendant.