DATAMATION SERVICES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Datamation Services, Inc. v. Commissioner
Docket No. 855-74.
United States Tax Court
T.C. Memo 1976-252; 1976 Tax Ct. Memo LEXIS 149; 35 T.C.M. (CCH) 1092; T.C.M. (RIA) 760252; August 16, 1976, Filed *149 Irwin B. Robins, for the petitioner. Michael A. Menillo, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined deficiencies in petitioner's Federal corporate income taxes in the amounts shown below: Year Ended
Deficiency
12/31/64
$ 6,191
12/31/67
44,586
12/31/68
148,479 The deficiencies resulted from a determination of the Commissioner that a certain 1970 loss was capital rather than ordinary. This determination first reduced the claimed 1970 net operating loss which petitioner had carried back to 1967 and 1968, and then the resulting recomputation of 1967 income affected an investment credit carryback from 1967 to 1964. The two issues before us are: (1) whether the stock of petitioner's wholly-owned subsidiary ("CSEC") was a capital asset, so that the loss sustained by petitioner upon the sale of that stock in 1970, was capital rather than ordinary; and (2) whether petitioner's investment in the subsidiary became worthless in 1970 prior to the sale so that the loss would be treated as ordinary under section 165(g)(3), I.R.C. 1954. [1] *150 FINDINGS OF FACT The parties have filed a stipulation of facts which, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioner, Datamation Services, Inc. ("Datamation"), was incorporated under the laws of the State of New York on December 22, 1958. Its principal office is located at 461 Eighth Avenue, New York, New York. 1. Was the "CSEC" stock owned by petitioner a capital asset? During the relevant years, Datamation's business consisted of providing a variety of data processing services to educational institutions, hospitals, and industrial, commercial, financial, and professional organizations. To provide these services, Datamation used computers and related data processing equipment and techniques. In its business, Datamation employed computer programmers to organize and translate business problems into specific *151 procedures and instructions for the computers. During 1968 about 65 of Datamation's employees worked as programmers. Although Datamation experienced a shortage of programmers in 1968, and in fact turned away some business that it could have handled if it had had additional programmers, its need for programmers declined in 1969, and it was no longer faced with a shortage. Datamation hired most of its programmers through employment agencies. In general, programmers hired through agencies not only had attended schools where they were taught programming, but also had obtained actual working experience, often as programmers in the ranks of large insurance companies. Other programmers were recruited through word-of-mouth recommendations. And, in addition, Datamation hired some programmers directly upon their graduation from computer programming school. During the years in issue, there were many computer programming schools in New York City. Datamation's business increased substantially between 1964 and 1968, as shown in the following table: Year
Revenues
Net Income
1964
$1,205,550
$ 82,635
(Unaudited)
1965
2,170,129
194,950
(Unaudited)
1966
2,918,648
197,194
1967
3,461,371
158,205
1968
3,957,960
293,694
*152 In 1969, the company was believed to be one of the ten largest organizations providing diversified data processing services in the greater New York City area. By 1968 Datamation had adopted a policy of expansion by the acquisition of other companies. In May of 1969, Datamation issued a prospectus in which the following statement appears: Acquisition and Franchising Policy The Company has adopted a policy of actively seeking acquisitions. Although the Company is presently engaged in preliminary discussions with other companies, it has not reached any agreement or understanding regarding specific acquisitions. There can be no assurance that the Company will successfully complete any acquisition or that, if completed, such acquisition will be advantageous to the Company. Datamation's officers investigated the possibility of acquiring (1) a market research company whose business generated a great deal of computer work; (2) a manufacturer of continuous form paper used by computers; and (3) a school for the training of computer programmers. However, the only company which Datamation actually acquired was CSEC, [2] a corporation involved in the operation of computer training schools as well *153 as other businesses. And it is the proper characterization of the loss Datamation sustained as a result of its investment in CSEC which is the subject of the present controversy. Before CSEC was acquired, Datamation's officers considered two alternative methods by which Datamation could acquire a computer programming school. The two alternatives are reflected in the minutes of a Special Meeting of the Board of Directors of Datamation Services, Inc., held on August 1, 1968, as follows: Mr. [Thomas] Connors [President of Datamation] reported on the investigation of Data Processing Training Schools. He reported that all schools located to date had either just started in business or had grown so big that it would be impractical for Datamation Services, Inc. to acquire them. He suggested that a more feasible program might be for the company to start its own school. After some discussion, it was *154 generally agreed that the next approach would be to try to locate a top man, experienced in these types of schools, and try to make arrangements with him to organize a school for Datamation Services, Inc.
At some time not indicated by the record, representatives of Datamation asked the landlord of the building in New York City where Datamation maintained its principal place of business if it would be possible to operate a school on the third floor of the building in space which was already leased by Datamation. The record does not indicate with specificity the substance of the questions asked of the landlord, nor does it present any response he may have made. On October 24, 1968, Mr. Connors again reported to Datamation's Board of Directors with respect to the computer training school project. The minutes of that meeting of the Board disclose the following discussion: Mr. Connors reported that an individual had been located who, on initial investigation, appeared to be quite capable of establishing a school for the company. He wanted $25,000 advance to write a new text, plus $25,000 per year salary and a 20% interest in the school. It was suggested that Mr. Connors, Mr. White *155 and Mr. Goodfriend meet with this prospect at the earliest possible date and that a Proudfoot Report on the gentleman be obtained to assist in further evaluation of this project. The "individual" mentioned in the above-quoted minutes was Robert Farr. After several meetings with him, Datamation's officers decided not to employ Mr. Farr to start a school for us, because * * * we determined that he would not operate the type of school that we were interested in. He wanted $25,000 in salary, and $25,000 to write a curriculum, and a percentage of the school. He wanted other things, and we didn't really think that the type of curriculum and school that he would have started for us was what we wanted. In November, 1968, Datamation first learned that it might be able to acquire a corporation named Computer Systems and Educational Corporation, Inc. ("CSEC"). The primary business of CSEC was the operation of technical schools for the training of computer programmers and operators in Hartford, Connecticut, and Providence, Rhode Island, as well as a school for electronic technicians in Boston, Massachusetts. It appears that the corporate structure of CSEC was undergoing certain rearrangements *156 during 1968 and early 1969. However, as of March 7, 1969 (the date CSEC was ultimately acquired by Datamation), CSEC functioned primarily, if not exclusively, through its wholly owned subsidiaries, which consisted of the following: Name
Location
Nature of Operation
Financial General Corpora-
Connecticut
Financed tuition of
tion
students at CSEC
schools
International Academy, Inc.
Hartford,
School for computer
of Connecticut (here-
Conn. *
programmers and
after "Hartford School")
operators
Computer Processing Cor-
Hartford,
Computer Service
poration (hereafter
Conn.*
Bureau
"Hartford Service Bureau")
Computer Processing Insti-
Providence,
School for computer
tute of Rhode Island, Inc.
R.I.
programmers and
(hereafter "Providence
operators
School")
Massachusetts Radio And Elec-
Boston, Mass.
School for electron-
tronics School, Incorporated** *157 ics technicians
(hereafter "Mass. Radio")
International Academy, Inc.
Massachusetts
Inactive ***
of Massachusetts
International Academy, Inc.
Maine
Inactive ***
of Maine
All of the CSEC schools were approved by appropriate state rehabilitation agencies and by the Veteran's Administration rehabilitation agency. The schools were licensed by appropriate state authorities. By May 27, 1969, CSEC had applied for accreditation with the National Association of Trade and Technical Schools. During the five year period 1964 through 1968, CSEC had gross revenues and net income in the amounts shown by the following table: Income (Loss)
Before Extraor-
Net Year
Revenues
dinary charge
Income (Loss)
1964
$ 30,392
[5,945)
[5,945)
1965
96,085
(12,311)
(12,311)
1966
360,216
19,015
19,015
1967
888,275
36,201
36,201
1968
1,655,977
135,050
35,201 * As of December 31, 1968, the consolidated balance sheet of CSEC reflected the following: Current Assets
$547,104
Property & Equipment (Net after
Accumulated Depreciation &
Amortization)
120,198
Goodwill
5,000
Deferred Expenses
261,679
TOTAL ASSETS
$933,981
Current Liabilities
$486,937
Long Term Debt
60,354
Deferred Income
247,187
Deferred Federal Income Taxes
36,700
TOTAL LIABILITIES
$831,178
Capital Stock Outstanding
$ 1,000
Paid In Capital
33,736
Retained Earnings
68,067
TOTAL EQUITY
$102,803
The *158 officers of Datamation examined these figures and concluded that CSEC "certainly did look like a good thing." On February 4, 1969, Datamation and the five individuals who then owned all of the issued and outstanding stock of CSEC entered into an agreement which provided for the acquisition of CSEC by Datamation. The acquisition was to take place through an exchange of the stock of the two corporations. The stockholders of CSEC agreed to transfer to Datamation all the stock of CSEC in return for shares of Datamation common stock, which Datamation agreed to issue. The number of Datamation shares thus to be exchanged was to be determined in accordance with a formula which fixed the "price" for the acquisition of the CSEC shares on the basis of CSEC's pre-tax net earnings. Part of the price was to be paid (in shares of Datamation stock) at the closing, and was designated as the "basic purchase price". In addition to the basic purchase price, the CSEC shareholders were in future years to receive additional Datamation stock, contingent upon CSEC's earnings in those years. The agreement of February 4, 1969, imposed substantial restrictions on any subsequent disposition of the Datamation *159 stock which was to be issued to the CSEC stockholders. These restrictions reflected the fact that the stock to be issued had not been registered with the S.E.C. and therefore could not have been sold in a public offering. Datamation actually acquired all the outstanding capital stock of CSEC on March 7, 1969. The acquisition was completed in accordance with the agreement of February 4, 1969, as modified by a Supplemental Agreement made on the closing date, March 7, 1969. The parties have stipulated that the acquisition of the CSEC stock constituted a tax-free reorganization as defined in section 368(a)(1)(B), I.R.C. 1954. And they have also stipulated that Datamation's tax basis for the CSEC stock which it acquired was the same as the tax basis of the CSEC stock in the hands of the former shareholders, namely, $34,736. As modified by the supplemental acquisition agreement, the price which Datamation agreed to pay for CSEC was as follows: a. The basic purchase price, payable on the closing date, was 115,000 shares of Datamation common stock. b. If the earnings of CSEC reached certain agreed upon levels [3] during each of the next three years, [4] a maximum total of 115,000 additional *160 shares of Datamation common stock would be issued to the former CSEC stockholders. In conjunction with the acquisition of CSEC, Datamation and the selling stockholders entered into certain other personal services agreements, including employment contracts and covenants not to compete. On the date that CSEC was acquired, Datamation shares were quoted in the over-the-counter market at $19 bid and $21 asked. On May 27, 1969, Datamation issued a prospectus which offered for sale to the public 264,450 shares of its common stock then owned by a group of its shareholders. Included among the group of selling shareholders were all five of the former owners of CSEC. Each of the former CSEC shareholders offered *161 to sell approximately 25 percent of the Datamation common stock which he had received in exchange for his interest in CSEC. The Datamation stock was offered to the public at $14 per share. After subtracting an underwriting discount of $1.05 per share, the selling stockholders received $12.95 for each share sold. All of the shares offered by this prospectus were sold. The prospectus described the business of both Datamation and CSEC in considerable detail. It reported the following plans for future business activities: 1. "CSEC is now accepting applications at its Providence school for courses in electronics which are expected to commence in the fall of 1969". 2. "CSEC operates a data processing service center located at its Hartford school and intends to commence a similar operation at its Providence school in the latter part of 1969". 3. The statement of Datamation's intent to seek acquisitions quoted supra, at p. 5, which was followed by the declaration of CSEC's plan to sell franchises that appears below: CSEC is actively seeking an arrangement for the sale of franchises through an unaffiliated company. Such franchises would combine a computer school and a service center *162 and would operate in a manner similar to CSEC's facilities in Hartford. No assurance can be given that CSEC will successfully make such arrangement or that if CSEC undertakes such franchising, it will be profitable. One of the purposes, but not the major one, in Datamation's acquisition of CSEC was the expectation that CSEC might serve as a source of programmers for Datamation, primarily through the establishment of a school in petitioner's leased space in New York and secondarily from among the graduates of the existing CSEC schools. However, as found above, supra, p. 3, the need for programmers declined in 1969, and petitioner obtained at most only two or three programmers from the Hartford school and none from the other CSEC schools. Moreover, it does not appear that any specific plans were ever formulated or that any serious steps were taken looking towards the establishment of a school in New York, and no such school was in fact ever established. Petitioner's principal purpose in acquiring the stock of CSEC was to obtain a profitable investment. 2. Did the stock of CSEC become worthless before April 21, 1970? Datamation's data processing service business encountered certain *163 problems, the severity of which was not clearly indicated by the record, during 1969. Moreover, soon after the acquisition, CSEC experienced operating difficulties. Datamation's officers "learned that the business of CSEC was not as good as [they] thought, and as smooth running as [they] thought it was, and * * * learned very shortly thereafter that there was a short cash flow need [sic] of the corporation". Conflicts arose between the executives of CSEC and the executives of Datamation. For the year ended December 31, 1969, CSEC and its subsidiaries generated gross revenues and incurred net losses as follows: Gross Revenues
$1,301,147
Loss (Before recognition of
382,776
Federal income tax credits)
Net Loss (After giving effect to
354,560
Federal income tax credits
arising from carry-back of
net operating losses)
The consolidated balance sheet of CSEC as of December 31, 1969, reflected the following: Current Assets
$ 475,528
Property & Equipment (Net)
124,552
Deferred Expenses
188,683
Other Assets
2,940
TOTAL ASSETS
$ 791,703
Current Liabilities
$ 687,674
Long Term Debt
6,325
Deferred Income
160,821
Advances from Datamation
188,640
TOTAL LIABILITIES
$1,043,460
Capital Stock Outstanding
$ 1,000
Paid in Capital
33,736
Retained Earnings
(286,493)
TOTAL EQUITY
$ (251,757)
Thus, *164 during 1969 and 1970, it became necessary for Datamation to advance funds to CSEC for working capital. These funds were advanced on open account with no specific maturity date or interest rate. Both the advances and any repayments of these advances were recorded in Datamation's general ledger under the heading "Loans Receivable-CSEC". Datamation also paid interest for the benefit of CSEC in the amount of $1,280 during 1969. This was recorded on Datamation's general ledger as "Prepaid Interest-Receivable". On April 20, 1970, the total net amount of cash advanced by Datamation to CSEC was $253,089. [5] *165 This amount was composed of the following items: Advanced
Repaid
Net
Cash Advances 1969
$347,360
$160,000
$187,360
Interest Paid 1969
1,280
0
1,280
Cash Advances 1970
137,549
73,100
64,449
Total
$253,089
On October 31, 1969, Datamation executed and delivered to the Constitution National Bank of Hartford, Connecticut, a guarantee of the obligations of Financial General Corporation up to a maximum of $160,000. Datamation executed this guarantee because without it Financial General would not have been able to borrow the funds it needed. On November 4, 1969, Financial General Corporation borrowed $160,000 from the Constitution National Bank. The $160,000 was transferred directly to CSEC. The bank loan was originally due on February 2, 1970, but on that date it was renewed until May 4, 1970. On April 16, 1970, under circumstances more fully described hereafter, Datamation paid $160,000 to the Constitution National Bank in full payment of Financial General Corporation's debt. By this payment, Datamation fulfilled its obligation under the October 31, 1969, guarantee agreement. The operation of Mass. Radio, CSEC's Boston school for electronics technicians, gave rise to additional problems. Some of *166 the school's students apparently claimed that they were entitled to refunds. Neither the basis for nor the amount of these claims appears in the record. However, the Office of the Attorney General of Massachusetts dealt with a complaint made by students who were dissatisfied with Mass. Radio's handling of their claims. This complaint was settled in December, 1969, by an agreement among the parties. Datamation's counsel and officers of CSEC met on February 9, 1970, with representatives of the Massachusetts Department of Education. The Massachusetts officials expressed their concern over the shaky financial condition of Mass. Radio. They indicated that if Mass. Radio were liquidated, some provision would have to be made for the "teaching out" of students already enrolled or else refunds would have to be made. The state officials warned that CSEC, or its directors or shareholders would be held responsible for the obligations of Mass. Radio, and that if they attempted to avoid this responsibility a consumer fraud action might be instituted against them. As of March 26, 1970, Mass. Radio was operating without a license from the State of Massachusetts due to the dissatisfaction of *167 state authorities with its financial condition. Because Mass. Radio did not have a license, state authorities could have forced the school to cease operations at any time. Datamation's officers and directors were impressed both with Datamation's own business problems, and also with the more severe problems associated with CSEC's operations. On November 3, 1969, the Board of Directors of Datamation passed the following resolution: RESOLVED, that Thomas Connors, President of the corporation, be and he hereby is authorized and empowered to explore the possibilities of the sale of the CSEC division. On January 22, 1970, Datamation's Board of Directors was told that the condition of the schools was still deteriorating and that unless Datamation could raise additional cash or dispose of its interest in the CSEC operation, the schools would have to be closed down without delay. But when, in February of 1970, Datamation's directors learned that in the opinion of the Massachusetts authorities the parent companies (i.e., CSEC and Datamation) and their directors might be liable for the obligations of Mass. Radio, they concluded that a sale of the schools to a solvent purchaser would best *168 solve their problem. Datamation's directors also felt that Datamation could be harmed by adverse publicity if CSEC were simply allowed to go bankrupt. Datamation considered three separate proposals for the sale of CSEC. A "Letter of Intent" dated February 5, 1970, proposed the sale of CSEC to a group of individuals including Charles Bourland and David Shefrin, two of the original CSEC stockholders who had remained employees of the company. A different letter to Datamation, dated February 17, 1970, set forth the suggested terms of an agreement to sell CSEC to Computer Environments Corporation ("CEC"), an otherwise unidentified Maryland corporation. After several meetings between Datamation and representatives of CEC, the prospective purchaser lost interest in the deal and decided not to make an offer to buy CSEC. The third proposal was contained in a contract for the sale of CSEC entered into by Datamation and Northeast Computer Systems, Inc. ("NCS"), on March 12, 1970. NCS was controlled by a group which included Bourland and Shefrin. This agreement, as modified by certain amendments made on April 21, 1970, set forth the terms and conditions upon which CSEC was in fact sold. *169 The March 12, 1970, agreement for the sale of CSEC to NCS provided in relevant part: 1. As the purchase price for the stock of CSEC, NCS was to pay Datamation a maximum of $60,000, to be reduced by $1 for every $2 of net stockholder deficit above $182,757 as of December 31, 1969. 2. Datamation represented that as of March 12, 1970: (c) Absence of Undisclosed Liabilities. It has no knowledge of any liabilities or obligations of CSEC as of December 31, 1969, absolute accrued, contingent or otherwise, which are not fully reflected or reserved against in the certified balance sheet as at that date, or in the notes thereto, nor of any liabilities or obligations of CSEC at the date hereof, absolute, accrued, contingent or otherwise, which have not been or will not be fully reflected or reserved against in the books and records of CSEC, none of which have been entered into other than in the ordinary course of business. 3. Datamation released CSEC from all its obligations to Datamation up to $240,000. NCS agreed to repay any obligations of CSEC to Datamation in excess of $240,000 up to a maximum repayment of $100,000. 4. Datamation released its rights under the employment contracts *170 and covenants not to compete binding the original CSEC shareholders. It also assumed a continuing obligation of CSEC to its former president who had resigned in September, 1969. [6]
5. Datamation specifically assumed the $160,000 Financial General note which it had previously guaranteed; Datamation agreed to pay off the note and to release Financial General and CSEC from their obligation to repay Datamation. 6. Datamation's rights to use CSEC-developed computer "software" were spelled out, with certain temporal and geographical restrictions. Competing use of the software by NCS or CSEC was similarly limited. Datamation was to receive the proceeds from all except the first two sales of software packages, made by CSEC within 45 days of the closing. 7. NCS represented that it would have a paid-in capital of at least $150,000 by the closing date and $300,000 by June 30, 1970. NCS was to have no obligations *171 under the agreement unless it had received $150,000 of paid in capital by the closing date. 8. CSEC was given the right to borrow up to $50,000 from NCS between March 12, 1970, and the date of the closing. These borrowings were to be secured by CSEC's accounts receivable. The sale took place on April 21, 1970, pursuant to the terms of the agreement of March 12, 1970, as modified by an amendment thereto executed at the closing. This amendment modified the original agreement of sale in the following material respects: 1. The ostensible purchase price of up to $60,000 was reduced to $1. 2. Datamation's representation as to the "Absence of Undisclosed Liabilities", paragraph 3(c) of the original agreement was modified by adding the following sentence: It has no knowledge of any material adverse change between December 31, 1969 and the date hereof, affecting the financial condition of CSEC, except with respect to Massachusetts Radio & Electonics School Incorporated and except that CSEC has been operating at a loss throughout the period and its financial condition has been deteriorating steadily. 3. Section 4 of the original agreement was amended to require the payment by NCS to *172 Datamation of all advances made by Datamation to CSEC in excess of $202,880 (instead of $240,000 as originally provided) up to a maximum of $100,000.
At the closing on April 21, 1970, NCS delivered to Datamation three checks, all dated April 21, 1970: one in the amount of $1; one in the amount of $12,880; and one in the amount of $37,120. The total amount of these checks was $50,001. Datamation never received any funds, pursuant to the contract with NCS, on account of sales of software packages by CSEC. And although Datamation had the right to use, within certain geographical limits, any new software packages developed by CSEC during the two years following the sale to NCS, CSEC did not develop any such packages. Datamation incurred legal and accounting fees in connection with the sale of the CSEC stock to NCS in the amount of $24,669. Datamation suffered a net loss of $422,493 in 1970 in connection with its investment in CSEC. The components of this loss are as follows: Total Invested in CSEC
1. Basis of stock acquired
(March 7, 1969)
$ 34,736
2. Net cash advances (1969)
187,360
3. Interest paid for the benefit
of CSEC (1969)
1,280
4. Net cash advances (1/1/70 -
4/20/70)
64,449
5. Payment on Financial General
bank note
160,000
6. Legal and accounting fees in-
curred in connection with
sale of CSEC to NCS
24,669
$472,494
Amount Received On Sale of CSEC
50,001
Net Loss
$422,493
The *173 Commissioner's determination of deficiency was based on the decision that this amount represented a capital loss, deductible only in accordance with sections 165(f), 1211(a) and 1212. Petitioner contends that this amount is properly characterized as an ordinary loss under either one of the following theories: [7]
a. The stock of CSEC was not a capital asset in Datamation's hands, therefore the loss incurred on its disposition was not a capital loss. b. Even if the stock was a capital asset in Datamation's hands, the stock (1) became worthless during 1970 while it was owned by Datamation, and (2) was a security of an "affiliated corporation" as defined in section 165(g)(3)(A) and (B); therefore, pursuant to section 165(g)(3), the loss incurred on its worthlessness was not a capital loss. ULTIMATE FINDINGS OF FACT 1.Datamation acquired CSEC primarily because it thought the CSEC operation would be a profitable investment. The purpose of utilizing CSEC as a source for obtaining programmers (either directly from CSEC's schools or from a school in New York City which CSEC might conceivably *174 establish) or of achieving any other objective relating to the conduct of Datamation's business was at most a secondary consideration. 2. All advances from Datamation to CSEC, including both direct cash advances and payment pursuant to the guarantee of the bank loan, were contributions to capital. 3. The stock of CSEC did not become worthless at any time between December 31, 1969, and April 21, 1970. OPINION In March, 1969, petitioner, a corporation in the business of providing data processing services acquired 100 percent of the stock of CSEC, a corporation which operated two schools for the training of computer programmers, one school for the training of electronics technicians, and a data processing service bureau. Subsequent to the acquisition, petitioner provided funds to or on behalf of CSEC, both in the form of direct cash advances and in the form of a loan guarantee. Eventually, on April 21, 1970, petitioner sold all its CSEC stock. Overall, petitioner sustained a loss of $422,493, [8] in connection with its acquisition, holding, and disposition of CSEC. We must decide whether this amount represents a capital loss which may be deducted only to the extent allowed by sections 165(f), *175 1211, and 1212, I.R.C. 1954. Because (1) the CSEC stock was a capital asset owned by petitioner and (2) the CSEC stock did not become worthless between December 31, 1969, and April 21, 1970, we hold that petitioner did indeed suffer a capital loss. We therefore sustain the deficiencies determined by the Commissioner. 1. Was the stock of CSEC a capital asset held by petitioner? Section 1221 defines as "capital assets" all but five types of property held by a taxpayer. However, it has been authoritatively determined that some property, even though not described in any of the five enumerated statutory exclusions, is, nevertheless, to be excluded from the category of "capital assets". Judicially created limitations on capital asset status have been fashioned -- most notably in Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955) -- to implement the legislative *176 policies underlying the special tax treatment accorded to capital gains and losses. The Court in Corn Products explained that Congress provided preferential tax treatment for capital gains because (350 U.S. at p. 52): Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss.The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from… excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions". Burnet v. Harmel, 287 U.S. [103] at 106. The guidelines of the Corn Products decision have been applied to classify numerous types of property in a variety of factual settings. In cases involving the acquisition [9] *178 by one corporation of the securities of another corporation, the motives of the acquiring corporation determine the character of the securities in its hands. Booth Newspapers, Inc. v. United States,303 F.2d 916 (Ct. Cl.); W.W. Windle Co.,65 T.C. 694. In Booth Newspapers, at p. 921, *177 the Court of Claims described the alternative motives for an acquisition and the effect of either motive on the status of the securities acquired as follows: * * * if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, [then they are non-capital assets]. * * * If on the other hand an investment purpose be found to have motivated the purchase or holding of the securities [then they are capital assets]. * * * (Emphasis added.) This formulation of the "integrated business activities" exception to the definition of a capital asset has been frequently repeated and approved. See, e.g., Schlumberger Technology Corp. v. United States,443 F. 2d 1115, 1120-1121, and cases collected therein at fn. 7, 8 (C.A. 5), affirming in part and reversing in part 305 F. Supp. 1020 (S.D.Texas); Dearborn Company v. United States,444 F. 2d 1145, 1166 (Ct. Cl.) and cases cited therein; W.W. Windle Co.,supra,65 T.C. at 708; Chemplast, Inc.,supra,60 T.C. 623, 630 and cases cited therein, affirmed 506 F. 2d 1050 (C.A. 3). If the taxpayer intended to realize its gain from the profitable operations of the company whose securities were acquired and from the resulting increase in value of its investment therein, then the acquisition is held to have been motivated by an "investment" purpose, and the securities so acquired are capital assets.See, *179 e.g., Dearborn Company v. United States,supra,444 F. 2d at 1166, par. 62 and 63; Midland Distributors, Inc. v. United States,481 F. 2d 730, 735 (C.A. 5). On the other hand, if the taxpayer bought the securities in order to preserve or enhance the profitability of its own "everyday operations" which are its "normal source of business income", then the acquisition is held to have been motivated by a "business" purpose, and the securities so acquired are non-capital assets. Corn Products Refining Co. v. Commissioner,supra,350 U.S. at 52; Schlumberger Technology Corp. v. United States,supra,443 F. 2d at 1121-1122; Chemplast, Inc.,supra,60 T.C. at 631-632. In the case before us, we have found as a fact that petitioner's predominant motivation was the desire to make a profitable investment. Any "business" benefits sought in connection with this acquisition were at most secondary and relatively insignificant motivating factors. This finding -- that petitioner acquired CSEC primarily as an investment -- was based on the record as a whole, and especially on the circumstances surrounding the acquisition itself and on the business background of and the potential business relationship *180 between the two companies. Cf. Chemplast, Inc.,supra,60 T.C. at 631. In the first place, petitioner's prospectus, issued in May, 1969, stated that it had "adopted a policy of actively seeking acquisitions" and the documentary evidence before us strongly indicates that such policy had been adopted no later than in 1968. It is our best judgment that CSEC was acquired as part of this general policy of seeking profitable investments rather than specifically to enhance petitioner's existing data processing service business. Cf. John J. Grier Co. v. United States,328 F. 2d 163, 165 (C.A. 7), affirming 216 F. Supp. 928 (N.D. Illinois) (stock of restaurant acquired by corporation already in the business of operating restaurants held a non-capital asset). Secondly, we note that CSEC had experienced spectacular growth in revenues and earnings during the five years preceeding the acquisition. When one of petitioner's officers testified that he evaluated the figures and CSEC "certainly did look like a good thing," there is no doubt that he meant "a good investment." This history of growing earnings and revenues stands in marked contrast to the background of the subsidiaries acquired in *181 Schlumberger Technology Corp. v. United States,supra, a case on which petitioner heavily relies. In that case, one of the subsidiaries had just emerged from bankruptcy and the other was organized as part of the acquisition transaction. 443 F. 2d at 1117-1118. In Chemplast, Inc.,supra, the subsidiary was likewise organized specifically as part of the acquisition transaction. 60 T.C. at 631. Thirdly, the price paid for CSEC was determined by reference to CSEC's earnings both up to the time of the acquisition and for several years thereafter. This suggests that the profitable operations of CSEC were an important factor in petitioner's decision to acquire the company. Moreover, there was no evidence that petitioner paid a premium for the stock. The presence of such a premium has been interpreted as an indication that the stock was more valuable to a particular purchaser (presumably because of its relationship to his business) than it would be to investors at large. Dearborn Company v. United States,supra,444 F. 2d at 1167, par. 65(b) and cases cited therein.While the considerations referred to in this and the two preceding paragraphs may be viewed as theoretically consistent *182 with petitioner's principal alleged business purpose of acquiring CSEC in order to establish a source of programmers for its own business, we do not find, as discussed hereinafter, that such latter purpose was in fact the major motive in making the acquisition. In support of its contention that Datamation acquired CSEC for business rather than investment reasons, petitioner's witnesses explained: Datamation suffered from a continuing shortage of programmers; existing sources of programming personnel were inadequate in several respects; Datamation planned for CSEC to start a school for programmers in New York; and, so, Datamation would fill its needs for programmers by hiring the "top 5%" of the school's graduates. Moreover, Datamation's officers apparently visualized another benefit which could inure to their company from the operation of a computer programming school, namely, that students who were graduated from the school and were hired by other companies, might someday rise to positions of responsibility with their new employers. If and when this happened, these alumni might remember and call upon Datamation when they needed outside programming assistance. While these considerations *183 may have been taken into account to some extent by petitioner, we do not believe on the evidence before us that they played a major part in the acquisition.
The evidence as to the claimed overriding need for programmers in 1968 did not convincingly establish such need at the time of the 1969 acquisition. The testimony that it was in the fall of 1969 that such need no longer became a pressing one was vague and unsatisfying. Such testimony was loose and general, and we were left with the distinct impression that the availability of programmers had ceased to be a problem at an earlier time. Although the evidence indicates that there were some 200 students enrolled in the Hartford school, petitioner hired at most only 2 or 3 of the students. To be sure, many students would not have wished to go to New York to work, but there obviously could have been far more than 2 or 3 students out of the entire class who were qualified and who would be willing to work for petitioner in New York. Certainly, petitioner, upon whom the burden of proof rested, has not shown otherwise by convincing evidence. The record is unclear as to when the students graduated or became available to begin work. The *184 evidence indicates that the entire course covered a span of only some three to six months. Conceivably, graduation occurred every quarter, or possibly even more frequently, and if petitioner were serious in its efforts to obtain programmers, recruitment might well begin prior to graduation. Yet the evidence leaves us entirely in the dark as to whether petitioner was making any serious efforts to obtain any appreciable number of programmers from the Hartford school in March or April or May of 1969, and we cannot conclude on the basis of this vague record that petitioner undertook to make an acquisition of this comparative magnitude for the principal purpose of obtaining an allegedly much needed source of programmers, when out of an available pool of some 200 students it took only 2 or 3. Of course, we are fully aware of the evidence to the effect that petitioner was more interested in having a programming school established in New York. But the evidence falls short of proving that even any tentative plans (apart from a few exploratory inquiries) had been formulated to attain that objective. The attractive earnings record of CSEC over a five-year period, on the other hand, suggests *185 far more strongly to us in the light of the entire record that petitioner was more interested in obtaining a profitable investment than it was in providing itself with a source of programmers. Nor do we have any confidence in the a gument that petitioner was motivated to any substantial degree by the expectation that those CSEC graduates not hired by it would be a potential source of business for Datamation in the future. The matter is entirely too speculative, and we do not believe that it played any real part in petitioner's decision to acquire CSEC. We have found as a fact and we hold that petitioner's principal purpose in acquiring the stock of CSEC was to obtain a profitable investment, not to obtain a source of programmers or to achieve any other business objective. To the extent that any business objective played any part, its role was distinctly secondary in nature. We must therefore conclude that the CSEC stock was a capital asset, and that the loss in issue is subject to the statutory limitations governing capital losses unless petitioner is entitled to an ordinary deduction under section 165(g)(3). We now turn to that question. 2. Does Sec. 165(g)(3) convert petitioner's *186 loss to an ordinary loss?Section 165(g)(1) provides that (g) Worthless Securities. -- (1) General rule.--If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. Section 165(g)(3) modifies this general rule and in effect converts what would be a capital loss into a fullydeductible ordinary loss; it provides in part: (3) Securities in affiliated corporation.--For purposes of paragraph (1), any security in a corporation affiliated with a taxpayer which is a domestic corporation shall not be treated as a capital asset.* * * Petitioner contends that by virtue of section 165(g)(3), the loss which it sustained in respect of its investment in CSEC should be treated as an ordinary loss.However, we find that petitioner's investment in CSEC did not become worthless during 1970 while petitioner held the stock of CSEC. Therefore petitioner fails to come even within the general rule of 165(g)(1), and cannot possibly benefit from the limited extension of that general rule provided by section 165(g)(3). *187 [10]Byerlite Corporation v. Williams,170 F. Supp. 48, 61 (N.D. Ohio), reversed on another issue 286 F. 2d 285 (C.A. 6). Petitioner has the burden of proving that the stock of CSEC became worthless during 1970 before it was sold to a third party. Boehm v. Commissioner,326 U.S. 287, 294; Mahler v. Commissioner,119 F. 2d 869, 871 (C.A. 2). It is well established, that to give rise to a section 165(g) deduction, the security must become utterly valueless; even great shrinkage *188 in value is not enough, so long as "any recognizable value at all" remains. 875 Park Avenue Co. v. Commissioner,217 F. 2d 699, 701 (C.A. 2); Northeastern Consolidated Company v. United States,406 F. 2d 76, 79 (C.A. 7), affirming 279 F. Supp. 592 (N.D. Ill.), certiorari denied 396 U.S. 819. To establish the fact of worthlessness, petitioner must prove both that the stock had no present liquidating value (assets in excess of liabilities), and also, that there was no potential that such liquidating value would arise in the future as a result of an increase in assets or a decrease in liabilities. Sterling Morton,38 B.T.A. 1270, 1278, affirmed 112 F. 2d 320 (C.A. 7); Charles W. Steadman,50 T.C. 369, 376, affirmed 424 F. 2d 1 (C.A. 6), certiorari denied 400 U.S. 869. However, CSEC and its subsidiaries were functioning entities, engaged in carrying on a business, and petitioner has failed to prove that all reasonable chance of CSEC's future profitability evaporated between January 1 and April 21, 1970. Therefore, although petitioner sustained a substantial loss as a result of its investment in CSEC, that investment did not become worthless. The absence of potential value may be demonstrated *189 in one of two ways: [Ordinarily] [it can be established] only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. There are, however, exceptional cases where the liabilities of a corporation are so greatly in excess of its assets and the nature of its assets and business is such that there is no reasonable hope and expectation that a continuation of the business will result in any profit to its stockholders. Sterling Morton,supra,38 B.T.A. at 1279. The record contains no evidence that an "identifiable event" which ended all hope of future profitability occurred during the relevant period. The only hint of such an event lies in the opening statement of petitioner's counsel at trial that the evidence would show that CSEC became worthless in February, 1970. Presumably this date coincides with petitioner's increased awareness of the problems associated with Mass. Radio, including the potential liability of the parent companies (petitioner and CSEC) for Mass. Radio's obligations to its students. However, the discovery of the possibility that the corporation might be successfully sued at some time in the future does not nearly rise *190 to the level of an identifiable event finally signalling the worthlessness of the corporation's stock. Cf. 875 Park Avenue Co. v. Commissioner,supra, 217 F.2d 699 (C.A. 2). In the absence of an identifiable event, corporate stock will be treated as having become worthless only in "exceptional cases". In these cases, liabilities so far exceed assets that there is "no reasonable hope" that there will ever be any value attributable to the stock. Although CSEC's liabilities might have exceeded its assets during some time between January 1 and April 21, 1970, the deficit was not shown to have been so large as to make this one of the "exceptional cases". Insofar as the record discloses, petitioner continued to advance CSEC the funds necessary to keep it afloat. See, e.g., Rassieur v. Commissioner,129 F. 2d 820, 826 (C.A. 8), reversing a Memorandum Opinion of this Court; Benjamin v. Commissioner,70 F. 2d 719 (C.A. 2), and compare Frank C Rand,40 B.T.A. 233, 240, affirmed 116 F. 2d 929 (C.A. 8), certiorari denied 313 U.S. 594. Moreover, we note that NCS, as the purchaser of CSEC, not only paid Datamation $50,001 cash for the CSEC stock [11] but also agreed to advance up to $50,000 directly *191 to CSEC between March 12 and April 21, 1970. NCS further promised that it would have at least $150,000 paid-in capital by the date of the sale. To us these actions indicate that NCS had faith in CSEC's future and contradict any inference that the company had no hope of ever becoming profitable. In the light of these facts and the record as a whole we conclude that petitioner has failed to prove that the CSEC stock ceased to have any potential value before it was sold to NCS. To refute the analysis set forth above, petitioner has forcefully presented an ingenious and superficially appealing explanation of what it regards as the true substance of the transaction in which CSEC was sold to NCS. In short, petitioner argues that the terms of the several offers to purchase CSEC, as well as the terms of the final agreement of sale, establish that CSEC had a negative net worth. Petitioner asserts that these offers and the agreement show that no buyer would pay anything for the stock of CSEC unless Datamation released CSEC from the obligation to repay the advances which it had received from petitioner, and unless Datamation would pay off Financial General's $160,000 *192 bank debt and then release Financial General and CSEC from their obligation to repay this amount as well. Petitioner would have us treat these releases as contributions to the capital of CSEC made in conjunction with the sale to NCS. Since the amount of these contributions far exceeded the value of the cash and other consideration which petitioner received for its CSEC stock, petitioner concludes that the stock had become and had remained worthless until these additional contributions to capital were made at the time CSEC was sold to NCS. We reject petitioner's argument because we conclude that the "liabilities" which supposedly made the common stock of CSEC worthless did not in fact constitute debts for Federal income tax purposes. [12] *193 Some of these "liabilities" were based on the direct advances which petitioner made to CSEC. Others arose when petitioner, in its role as guarantor, repaid Financial General's bank debt. The explanation of our conclusion requires separate consideration of the direct advances and of the loan guarantee. Petitioner's analysis rests in part on the assumption that the direct cash advances to CSEC were loans in substance as well as name. To be sure, Datamation accounted for these funds under the heading "Loans Receivable"; and they were reflected as a liability on CSEC's balance sheet as "Advances from parent company". However, when judged by the traditional criteria which distinguish debt from equity for Federal income tax purposes, these advances are revealed to have been contributions to capital from the time they were initially provided. The advances were made on open account, with no interest rate and no specific maturity date. They were made to supply CSEC with the working capital it needed to continue operations in the face of declining business *194 fortunes. There can be no doubt that repayment of these amounts was wholly contingent on the profitability of CSEC's activities in the future. See, e.g., Ambassador Apartments, Inc. v. Commissioner,406 F. 2d 288 (C.A. 2), affirming 50 T.C. 236; Nassau Lens Co. v. Commissioner,308 F. 2d 39, 47 (C.A. 2), remanding 35 T.C. 268; Gilbert v. Commissioner,248 F. 2d 399 and 262 F. 2d 512 (C.A. 2); Matthiessen v. Commissioner,194 F. 2d 659 (C.A. 2); 2554-58 Creston Corp., 40 T.C. 932; 5 Mertens, Law of Federal Income Taxation Sec. 28.38 (1975 rev.). Proper characterization of the loan guarantee is somewhat more complex. Ultimately, we must decide whether when petitioner, as guarantor, repaid the bank, its resulting "creditor" status vis-a-vis CSEC and Financial General through subrogation was any different from its "creditor" status for tax purposes in respect of its direct advances to CSEC. We can find no meaningful difference between these two situations, and we hold that whatever may have been the rights of the parties intersese, petitioner never acquired the status of a creditor for Federal income tax purposes in connection with any of the guarantee-related transactions. Instead, *195 these transactions simply resulted in an increase in petitioner's equity investment in CSEC. The "traditional debt-equity principles" which determine whether a direct advance -- in the form of a loan -- constitutes a loan or a contribution to capital also determine whether an indirect advance -- in the form of a loan guarantee -- similarly constitutes a loan or a contribution to capital. See Santa Anita Consolidated, Inc.,50 T.C. 536, 550; Plantation Patterns, Inc.,T.C. Memo. 1970-182, 29 T.C.M. 817, 825, affirmed 462 F. 2d 712 (C.A. 5). Underlying the "traditional debt-equity" criteria is the fundamental motion that a valid debt, for Federal income tax purposes, exists when there is both a genuine intention that the funds be repaid and also a reasonable expectation based on economic reality that repayment will be made, independent of the success of the venture to which the funds are supplied. See, e.g., Gilbert v. Commissioner,supra,248 F. 2d at 406-407. Moreover, it is well established that these principles are to be applied as of the time the guarantee is entered into and not at the time the guarantor performs his obligation under the guarantee agreement. W. D. Roussel,37 T.C. 235, 242-243. *196 The record before us contains little evidence concerning the financial condition of CSEC and Financial General on October 31, 1969, the date petitioner entered into the guarantee agreement. Moreover, what evidence there is, is largely unfavorable to petitioner's position: CSEC was presented to us as a company which was in sore need of this money for working capital, [13] *197 and which would not have been able to borrow it from an outside source without the support of the guarantee. True, petitioner presented testimony that it did not expect to be called upon to perform its obligations under the guarantee agreement, but we had but little confidence in any such flat assertion. [14] We conclude that the payment pursuant to the guarantee agreement never gave rise to an indebtedness of CSEC to petitioner which could be treated as debt for Federal income tax purposes. Plantation Patterns,Incorporated v. Commissioner,462 F. 2d 712, 722-723 (C.A. 5), affirming a Memorandum Opinion of this Court, certiorari denied 409 U.S. 1076; W. D. Roussel,supra,37 T.C. 235, 242-243; cf. Peter E. Blum,59 T.C. 436, 439 and cases cited therein; Daniel Gimbel,36 B.T.A. 539. The determination that the funds were supplied to CSEC as contributions to capital rather than as loans means that neither the direct advances nor the payment pursuant to the loan guarantee created a debtor-creditor relationship for tax purposes between CSEC and petitioner. Therefore, while the "releases" may have altered the rights *198 of CSEC and petitioner as between themselves, for Federal income tax purposes they merely recognized and formalized what had always been the true relationship of the parties with respect to these funds. Because the funds were at all times an equity investment in CSEC, petitioner was not entitled to deduct the unrecovered portion of these advances or of the payment pursuant to the loan guarantee as bad debts. And just as petitioner is not treated as a creditor of CSEC for the purpose of allowing a bad debt deduction, so also it is not treated as a creditor of CSEC for the purpose of computing the value of the common stock of CSEC. Instead, the unrecovered portion of the advances and of the payment pursuant to the loan guarantee are treated on a par with petitioner's direct investment in the common stock of CSEC. Both amounts were contributions to CSEC's capital, and, like all contributions to capital, must therefore be added to petitioner's basis for its CSEC common stock. [15]Taylor v. Commissioner,298 F. 2d 198, 200 esp. fn. 1 (C.A. 4), affirming a Memorandum Opinion of this Court; Martin M. Dittmar,23 T.C. 789, 797-798; Charlie Sturgill Motor Co.,T.C. Memo. 1973-281, 32 T.C.M. 1336, 1352; *199 Hall Paving Co. v. United States,33 AFTR 2d 74-1192, 1200 (N.D. Ga.). And the $50,001 cash [16] *201 which petitioner received upon the sale of CSEC was in substance a payment for that stock. [17]Midland Distributors, Inc. v. United States,supra,481 F. 2d at 734. (Some amounts subsidiary owed to parent deemed bona fide debts; but other notes reclassified as equity; therefore, held: "Once the notes are characterized as stock, thus preventing an unjustified bad debt deduction, it is also appropriate to classify the debt as stock for the purpose of allocating liquidation assets.") Northeastern Consolidated Co. v. United States,supra,406 F. 2d at 79 ("Account receivable" of $300,000 owed parent by subsidiary reclassified as equity; assets of less than $200,000 distributed on liquidation; held, stock not worthless); Byerlite Corporation v. Williams,supra,170 F. Supp. at 59 (Loans in excess of $500,000 reclassified as equity; assets worth less than $150,000 distributed on liquidation; held, stock not worthless); accord, Pittsburgh Reflector,T.C. Memo. 1968-75, 27 T.C.M. 377, 379 (Advances created bona fide debts; payment received on sale of stock and notes applied only to notes, therefore, *200 stock was worthless); Keeney v. Commissioner,116 F. 2d 401, 403 (C.A. 2), affirming 40 B.T.A. 1381. To summarize, petitioner sustained a large loss as a result of its investment in CSEC. However, not only was its investment entirely capital in nature, but also, each component of the total investment was capital from the time it was invested. There was no new "infusion" of capital by petitioner at the time of sale in April, 1970, as contended by it. To the extent of the advances petitioner's capital investment occurred at the earlier times when the funds were made available to CSEC, and to the extent of the payment of the guarantee, petitioner's capital investment related back to the preceding October when it originally assumed the obligation. *202 By treating the advances and payment of the guarantee as capital investments, rather than as debts which petitioner forgave, it is plain that the stock of CSEC did not have a negative value in 1970 prior to the April sale. The stock did not become worthless in petitioner's hands in 1970, and the provisions of section 165(g) are therefore inapplicable. In the circumstances, we have no alternative but to hold that the resulting loss is subject to the statutory limitations with respect to capital losses. Decision will be entered for the respondent. Footnotes
1. Originally this case presented a third issue, namely, whether petitioner incurred an ordinary loss upon the worthlessness of certain "debts" it was owed by CSEC. These "debts" arose from various advances petitioner made to the subsidiary from time to time. However, in its reply brief, petitioner has conceded that "all advances * * * are to be treated as contributions to capital," thereby eliminating this third issue.
2. Except where a more limited meaning is clearly indicated, the designation "CSEC" is used throughout this opinion to refer to the affiliated group of corporations consisting of Computer Systems and Educational Corporation, Inc., and its subsidiaries, as more fully described, infra↩ at pp. 8-9.
*. The Hartford school and the Hartford service bureau shared facilities and equipment. ↩
**. As of January 1, 1968, and apparently as of December 31, 1968, Mass. Radio was a whollyowned subsidiary of Financial General Corp. The record does not disclose the circumstances under which it became a whollyowned subsidiary of CSEC. ***. The inactive subsidiaries had no assets whatsoever.↩
*. Net income for 1968 was reduced by an extraordinary charge of $99,849, representing a portion of the total expenses incurred under the terms of a settlement agreement in connection with the elimination of a ten-year franchise and royalty contract.↩
3. The supplemental agreement changed the levels of earnings which would trigger the issuance of the additional shares of Datamation common stock and also changed the rate (number of shares per dollar of earnings) at which these shares would be issued. The exact amount of these changes is not significant here. ↩
4. The stipulated document indicates that the parties have erroneously stipulated that the issuance of additional shares was to depend upon the earnings of CSEC for the next two years.↩
5. This figure was agreed to by the parties in paragraph 15 of their Stipulation of Facts. However, in paragraph 16 they further stipulated: "On April 21, 1970, Datamation notified its auditors, Lybrand, Ross Bros. & Montgomery, that the total amount owing from CSEC to Datamation as of April 20, 1970 was $252,880. This figure was $209 less than the total of the foregoing entries on Datamation's books".
6. That obligation required CSEC to pay its former president, Robert Herforth, $2,000 a month up to December 31, 1970, provided that he did not resume his position as an employee of CSEC or its successors. At the time of closing, the maximum extent of that obligation was $18,000.↩
7. As noted supra,↩ p. 2, petitioner has now dropped its claim that some of the loss resulted from a bad debt.
8. Although the components of the loss are not in dispute, the Commissioner incorrectly states the total amount as $422,284. The difference of $209 between that figure and the total loss actually sustained apparently reflects confusion as to the precise significance of Stipulation 16, quoted in Footnote 5 above at p. 18.↩
9. Of course, the motive of the acquiring taxpayer may change, and the character of the gain or loss at the time of disposition may depend upon the motive of holding the property at that time rather than at the time of acquisition. Chemplast, Inc.,60 T.C. 623, 632, fn. 9, affirmed 506 F. 2d 1050 (C.A. 3); Missisquoi Corporation,37 T.C. 791, 798; Gulftex Drug Co.,29 T.C. 118, 121 and cases cited therein, affirmed per curiam 261 F. 2d 238 (C.A. 5); FS Services, Inc. v. United States,413 F. 2d 548, 555 (Ct. Cl.). However, petitioner has not argued that there was any change of motive from investment to business here, and we may therefore confine our inquiry to the motive at the time of acquisition.Moreover, in the circumstances, we need not consider any possible distinction between such change and the converse situation of a change from business to investment as suggested in W.W. Windle Co.,supra,65 T.C. at 713-714↩, particularly fn. 15.
10. Because we find that the stock of CSEC did not become worthless, we need express no opinion on whether petitioner has met its burden of proving that it satisfies the other conditions of section 165(g)(3). While there is no doubt that petitioner is a domestic corporation, some question might exist either whether petitioner's entire investment in CSEC was a "security" (see Phil Kalech,23 T.C. 672, 681; Gussow, Kahn & Co.,13 T.C. 580, 584; Byerlite Corporation v. Williams,supra,170 F. Supp. at 55; cf. John P. Gawler,60 T.C. 647, affirmed 504 F. 2d 425 (C.A. 4)) or whether CSEC was an affiliated corporation as defined in section 165(g)(3)(B) (see Byerlite Corporation v. Williams,supra,170 F. Supp. at 57↩).
11. See fn. 17, infra↩.
12. Petitioner has conceded that "for purposes of this proceeding only, * * * all advances (including the payment of $160,000 on the guarantee) are to be treated as contributions to capital, and therefore, that petitioner had a basis of $422,493 in CSEC's stock". This concession disposed of any claim petitioner might have had that it was entitled to a bad debt deduction on the disposition of CSEC. However, wholly apart from this concession, the record amply supports the conclusion that both the advances and the loan guarantee were equity investments from the time they were made.
13. As noted in our findings of fact, the $160,000 which Financial General borrowed from the bank on November 4, 1969, was transferred directly to CSEC. By an unexplained coincidence, the evidence shows that CSEC repaid Datamation $160,000 on or before November 30, 1969. This was the only repayment of advances which CSEC made during 1969. 14. Republic Supply Company,66 T.C. 446↩, involving a complicated set of transactions is distinguishable in this critical respect. There a loan agreement provided for a definite repayment schedule and other business arrangements of the borrower were designed to provide it with a source of funds to meet this repayment schedule. On the basis of these objective circumstances, it was concluded that it was realistic for the borrower, the lender, and the guarantor, to intend and expect that repayment would be made by the borrower and not by the guarantor.
15. We note that petitioner's theory is based on an inconsistent treatment of both the advances and the loan guarantee.On the one hand, petitioner argues that they gave rise to liabilities which took precedence over, and therefore rendered worthless, the common stock of CSEC. But, at the same time, petitioner seeks to add the amount of the obligations to its basis for the common stock in order to compute the amount of loss. However, if petitioner's claims based on the advances and the loan guarantee in fact had priority over the rights of the common stock, then these higher priority claims did not become worthless. Thus, if we were to accept petitioner's characterization of the advances in question, the deduction allowable under section 165(g)(3)↩ in respect of petitioner's worthless security would be limited to petitioner's basis for the common stock of CSEC, i.e., $34,736. 16. Even if we were to accept petitioner's most farreaching assertion that the miscellaneous promises which formed part of the agreement of sale would result in a net additional cost to Datamatin of $18,000, still we could not find that the stock had become worthless. 17. We reject petitioner's attempt to allocate only $1 to the stock of CSEC and to treat the other $50,000 as a partial repayment of the advances. However this $50,000 may be described, the blunt fact is that it represented additional consideration paid by the purchaser for the CSEC stock. Moreover, petitioner's position is inconsistent with our determination that all the advances to CSEC are to be treated as contributions to capital, on a par with the direct investment in the common stock.↩